# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**NATHAN FOSTER**
       **Plaintiff,**

     **v.**                                             **Case No. 07-C-1100**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
       **Defendant.**

## DECISION AND ORDER

In December 2003, plaintiff Nathan Foster applied for social security disability benefits, claiming that he had been unable to work since August 2003 due to symptoms of mental illness. (Tr. at 108; 119-28; 273.) The Social Security Administration ("SSA") denied his application initially and on reconsideration (Tr. at 45-53; 275-80), so plaintiff requested review by an Administrative Law Judge ("ALJ") (Tr. at 54). The ALJ held a hearing at which plaintiff and a vocational expert ("VE") testified (Tr. at 281-311), but in a decision dated September 21, 2006, the ALJ also denied plaintiff's claim (Tr. at 34-39). Plaintiff appealed to the SSA's Appeals Council, which vacated and remanded, directing the ALJ to fully evaluate plaintiff's mental impairments under the applicable regulations and to address the medical opinions in the record. (Tr. at 42-44.)

On remand, plaintiff amended his claim to seek a closed period of disability ending in September 2006, as he had returned to work following a successful change in medications. (Tr. at 315; 320.) The ALJ held a new hearing as directed by the Council, at which plaintiff and another VE testified. (Tr. at 312-31.) However, in a decision dated July 25, 2007, the ALJ

essentially re-instated her previous ruling, finding that although plaintiff suffered from serious mental impairments he could nevertheless perform unskilled, simple work involving only occasional interaction with co-workers and no public contact, consistent with the requirements of his past employment. (Tr. at 19-25.) Plaintiff again requested review by the Appeals Council (R. 14), but this time the Council denied his request (R. 5), making the ALJ's ruling the final decision of the SSA on plaintiff's claim. See Murphy v. Astrue, 496 F.3d 630, 633 (7th Cir. 2007). Plaintiff now seeks judicial review of that decision pursuant to 42 U.S.C. § 405(g).

**I.**

Under § 405(g), I review the ALJ's decision to ensure that it is supported by "substantial evidence" and consistent with applicable law. Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. Berger v. Astrue, 516 F.3d 539, 544 (7th Cir. 2008) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). Under this deferential standard, I may not decide facts anew, re-weigh the evidence or substitute my judgment for the ALJ's. If the record contains conflicting evidence that would allow reasonable minds to differ as to whether the claimant is disabled, the responsibility for that decision falls on the ALJ. Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997).

However, this does not mean that I simply rubber stamp the decision without a critical review of the record. See, e.g., Scott v. Barnhart, 297 F.3d 589, 593 (7th Cir. 2002); Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000). Conclusions of law are entitled to no deference, so if the ALJ commits legal error reversal is required without regard to the volume of evidence in support of the factual findings. Binion, 108 F.3d at 782. The ALJ commits such error if she fails to comply with the SSA's rulings and regulations for evaluating disability claims. See

2

Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991). I likewise cannot uphold a decision that lacks a meaningful discussion of the important evidence, see, e.g., Giles v. Astrue, 483 F.3d 483, 486 (7th Cir. 2007); Briscoe v. Barnhart, 425 F.3d 345, 351 (7th Cir. 2005), fails to build an accurate and logical bridge from the evidence to the conclusion, see, e.g., Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002); Groves v. Apfel, 148 F.3d 809, 811 (7th Cir. 1998), or contains flawed logic or serious errors in reasoning, see, e.g., Indoranto v. Barnhart, 374 F.3d 470, 475 (7th Cir. 2004) (citing Carradine v. Barnhart, 360 F.3d 751, 754-56 (7th Cir. 2004)).

**II.**

According to the medical records submitted to the SSA, plaintiff sought mental health treatment in August 2003 based on symptoms of paranoia and auditory hallucinations. Providers at the Milwaukee County Mental Health Division diagnosed a psychotic disorder, post-traumatic stress disorder ("PTSD"), and a learning disability, with a GAF of 45.[1] (Tr. at 171-80.) Plaintiff subsequently received treatment, including therapy and medication, at Healthcare for the Homeless. (Tr. at 181-202; 244-57.) Plaintiff's treating psychiatrist in 2003 and 2004, Dr. Bruce Weffenstette, diagnosed a mood disorder and probable PTSD, with a GAF of 45. (Tr. at 257.) In November 2005, Dr. Steven Ortell assumed responsibility for plaintiff's care and diagnosed psychosis with a GAF of 45. (Tr. at 252.)

In a May 2006 report, Dr. Ortell opined that based on his mental impairments plaintiff would frequently experience symptoms which interfere with the attention and concentration

---

[1]GAF ("Global Assessment of Functioning") is an assessment of a person's overall level of functioning. Set up on a 0-100 scale, a score of 45 is indicative of a "serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

3

needed to perform even simple work tasks (Tr. at 237), that he would be absent more than four days per month based on his impairments (Tr. at 238), and that he was unable to meet competitive standards when it came to dealing with the normal work stress of even routine, repetitive work (Tr. at 240). Dr. Ortell further opined that plaintiff was "seriously limited" in his ability to interact with the public, work in coordination with others, complete a workday without interruption from psychological symptoms, and respond appropriately to supervisors and changes in a routine work setting. (Tr. at 240.) The vocational experts who testified at plaintiff's hearings indicated that these limitations would preclude work (Tr. at 306-07; 326-28), but the ALJ rejected Dr. Ortell's report, incorporating by reference the reasons set forth in her previous, vacated decision (Tr. at 22; 37).

Under SSA regulations, the opinion of a "treating source" like Dr. Ortell is entitled to "special consideration." Dominguese v. Massanari, 172 F. Supp. 2d 1087, 1100 (E.D. Wis. 2001). If well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record, the ALJ must afford such an opinion "controlling weight." Clifford, 227 F.3d at 870. Even if the ALJ finds that the opinion does not meet the standard for controlling weight, she may not simply reject it. SSR 96-2p. Rather, she must evaluate the opinion's weight by looking at the length, nature and extent of the claimant's and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist. 20 C.F.R. § 404.1527(d). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p. "Regardless of the weight the ALJ ultimately gives the treating source opinion, she must always 'give good reasons' for her

4

decision." Wates v. Barnhart, 274 F. Supp. 2d 1024, 1034 (E.D. Wis. 2003) (quoting 20 C.F.R. § 404.1527(d)(2)).

The ALJ set forth several reasons for rejecting Dr. Ortell's report (Tr. at 37), but none withstand scrutiny.[2] First, the ALJ noted that plaintiff was at times non-compliant with his medication regimen. However, she failed to explain how this cast doubt on any of Dr. Ortell's conclusions. Nor did she consider any explanations for plaintiff's non-compliance. See SSR 82-59 (stating that the ALJ must consider whether there is "justifiable cause" for the claimant's failure to follow prescribed treatment that would restore his ability to work). The record in this case contains at least two reasons why plaintiff did not always take his medication – "the voices" told him not to (Tr. at 295), and he could not afford it (Tr. at 244).[3] The ALJ addressed neither. See SSR 82-59 (listing inability to afford treatment as an example of justifiable cause); see also Sparks v. Barnhart, 434 F. Supp. 2d 1128, 1135-36 (N.D. Ala. 2006) (criticizing reliance on failure to comply with psychiatric treatment because mental illness itself can cause claimants to make poor judgments such as stopping medications).[4]

Second, the ALJ noted that in his initial, November 2005 assessment, Dr. Ortell found

---

[2]In his brief, the Commissioner states that Dr. Ortell's report is a check box form, with no supporting data provided. However, the ALJ did not say that, and principles of administrative law confine my review to the reasons she supplied. The ALJ (not the Commissioner's lawyers) must build an accurate and logical bridge from the evidence to the conclusion. Steele, 290 F.3d at 941.

[3]The record shows that after plaintiff started taking Loxitane – the medication he initially could not afford – his condition improved eventually allowing him to return to work.

[4]The Commissioner states that plaintiff failed to notify his doctors of the voices' directives. However, plaintiff did tell the ALJ, which is the material point under SSR 82-59. Further, the ALJ did not rely on plaintiff's failure to tell his doctors, so I may not rely upon such failure to uphold her decision. See Steele, 290 F.3d at 941.

5

some of plaintiff's answers "a little bit suspicious" (Tr. at 251) and suggested that he "may be exaggerating" his symptoms or going "through the motions maybe to get the medication he was looking for" (Tr. at 251-52). However, I find no similar references in any of the subsequent treatment notes, and Dr. Ortell continued to prescribe medications for plaintiff until a successful combination was found allowing a return to work. By May of 2006, Dr. Ortell had been treating plaintiff for six months, and his report contains no suggestion of malingering or drug-seeking behavior.

Third, the ALJ noted that Dr. Ortell's treatment records reflected an improvement in plaintiff's condition with medication. The ALJ's observation was correct but largely irrelevant to a proper evaluation of Dr. Ortell's report or this closed period claim. Plaintiff's improvement commenced only in June 2006, <u>after</u> Ortell prepared his report and shortly before plaintiff returned to work. A full review of Dr. Ortell's notes demonstrates the ALJ's error. In his November 2005 evaluation, Dr. Ortell assessed a GAF of 45 (Tr. at 252), a score suggestive of disability. <u>See</u> DSM-IV at 32-34.[5] On January 9, 2006, plaintiff reported persistent paranoia despite taking his medication. (Tr. at 250.) Plaintiff noted that things were "going a little bit better" on February 23, but on March 30 Dr. Ortell wrote that plaintiff continued to struggle with auditory hallucinations, "sometimes of the command type telling him to hurt himself." (Tr. at 248.) On April 26, Dr. Ortell noted that plaintiff still had psychotic symptoms and was not sleeping well due to auditory hallucinations, and he therefore increased plaintiff's medication dose. (Tr. at 247.) On June 1, Dr. Ortell wrote that plaintiff continued to have auditory hallucinations, inconsistently took one medication and derived no benefit from another. (Tr.

---

[5]Dr. Weffenstette, who treated plaintiff in 2003 and 2004, also found a GAF of 45 (Tr. at 255), as did the providers with Milwaukee County Mental Health (Tr. at 176).

6

at 246.) On June 5, Dr. Ortell noted that plaintiff still had psychotic symptoms, although the voices had "calmed down a little bit." (Tr. at 245.) On June 15, plaintiff reported that "he just started taking the Loxitane" and "it appears that it is working better . . . though he still feels a bit paranoid especially in crowds or in the waiting room today." (Tr. at 244; 268.) Finally, on July 12, plaintiff reported "doing very well with his current medication" (Tr. at 267), improvement that continued through 2006 and into 2007 (Tr. at 261-68). Thus, to the extent that the notes reflect appreciable improvement in plaintiff's condition, they post-date Dr. Ortell's report and essentially coincide with plaintiff's return to work in September 2006. It was therefore unreasonable for the ALJ to rely on them to reject the report or deny the claim.[6]

Fourth, the ALJ stated that despite Dr. Ortell's assessment of marked limitations in social functioning, plaintiff maintained a relationship with a girlfriend, family and friends. But as the ALJ herself noted earlier in her September 2006 decision, plaintiff "testified that he did not like to be around lots of other people and tended to avoid others." (Tr. at 36.) Although he lived with his niece and saw a girlfriend about twice each week (Tr. at 36), he denied going out with friends or family (Tr. at 299) and stated that when family came to visit his niece he did not "want to be around them" (Tr. at 300). This very limited interaction with others does not

---

[6]The ALJ's initial decision, which contains the specific reasons for her rejection of Dr. Ortell's report, issued on September 21, 2006. However, in her July 25, 2007 decision – the ruling now under review – the ALJ repeated the error of reasoning discussed in the text. In finding plaintiff's testimony not fully credible, the ALJ noted that plaintiff returned to work in September 2006 and admitted feeling better since then. (Tr. at 24.) Likewise, in discussing the new medical evidence submitted on remand, she made much of plaintiff's improvement in the latter half of 2006, continuing in 2007. (Tr. at 22.) The inference the ALJ apparently drew from plaintiff's recovery – that he could also work prior to September 2006 – is a non-sequitur; closed period cases always feature claimants who got better, and the mere fact of medical improvement says little about the severity of the claimant's limitations <u>during</u> the alleged term of disability.

7

contradict Dr. Ortell's finding as to plaintiff's social functioning, and the ALJ specified no other activities contrary to the doctor's assessment.

Finally, the ALJ noted that plaintiff was able to complete IQ testing in May 2006 without any difficulty. However, once again the ALJ failed to explain how plaintiff's ability to complete this test (which revealed a borderline IQ) casts doubt on Dr. Ortell's finding of diminished concentration or translates into the ability to concentrate on a full-time job.

The ALJ cited no contrary medical report in rejecting Dr. Ortell's findings, although she did state in her 2007 decision that she "concurs" with the state agency consultant's assessment of plaintiff's functioning. (Tr. at 22.) However, this raises another issue, as the consultant, Dr. Jack Spear, found that plaintiff was moderately limited in various work-related areas, including concentration, social interaction and adaptation. (Tr. at 216-17.) The VE at plaintiff's second hearing testified that these limitations would "seriously impact" plaintiff's ability to work (Tr. at 328-29), testimony the ALJ ignored.

Under SSA regulations, state agency medical and psychological consultants like Dr. Spear are deemed "highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p. While ALJs are not bound by findings made by state agency physicians and psychologists, "they may not ignore these opinions and must explain the weight given to the opinions in their decisions." Id. The ALJ erred in failing to discuss the apparent limitation on plaintiff's ability to work identified by Dr. Spear in this case.[7]

---

[7]The Commissioner contends that the VE seemed confused by Dr. Spear's form report and appeared to assume that a limitation upon an activity precluded the activity altogether. The VE did vacillate somewhat when questioned by the ALJ, but on re-cross he re-stated his belief that Dr. Spear's limitations would affect plaintiff's ability to perform his past work. (Tr. at

8

Based on the VE's testimony that adoption of the limitations found by Drs. Ortell and Spear would seriously impact if not preclude work, I cannot find the ALJ's errors harmless.[8] See Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) (stating that an ALJ's errors are harmless only if, under the proper legal standards, there is no reasonable possibility of a different result). Therefore, the ALJ's decision must be reversed.

Plaintiff asks for a judicial award of benefits, but not all material factual issues have been resolved in this case, and the record does not clearly support a finding of disability; therefore, the proper remedy is remand for further proceedings. See Neave v. Astrue, 507 F. Supp. 2d 948, 966-67 (E.D. Wis. 2007); see also Campbell v. Shalala, 988 F.2d 741, 744 (7th Cir. 1993) (stating that the disability determination "is essentially a factual finding best left for the Secretary to address in the first instance, unless the record can yield but one supportable conclusion"). Plaintiff notes that he has been through two hearings already. However, the Seventh Circuit no longer approves of judicial awards based solely on the SSA's "obduracy" or delays in resolving a claim. Neave, 507 F. Supp. 2d at 966 n.17 (citing Briscoe v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005)). I will, however, recommend that on this third remand the

---

330.) In any event, to the extent that the testimony was unclear, the ALJ was not free to ignore the ambiguity. See SSR 96-8p ("The adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."). Further, the Commissioner's argument in this vein is, once again, impermissibly post hoc. See Steele, 290 F.3d at 941.

[8]Plaintiff also argues that the ALJ erred by failing to evaluate his non-exertional limitations on a function-by-function basis. However, SSR 96-8p does not contain such a directive for mental (as opposed to physical) RFC. See Lechner v. Barnhart, 321 F. Supp. 2d 1015, 1036 (E.D. Wis. 2004). The Ruling does require "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p. On remand, the ALJ must provide the required explanation.

9

Commissioner assign the case to a different ALJ, as the decisions on file suggest "an unshakable commitment to the denial of this applicant's claim." Sarchet v. Chater, 78 F.3d 305, 309 (7th Cir. 1996).

**III.**

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this case is **REMANDED** for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 30th day of April, 2008.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge